969 So.2d 1039 (2007)
Kevin O'HALLORAN, as trustee and individually as alleged assignee, Appellant,
v.
PRICEWATERHOUSECOOPERS LLP, Appellee.
No. 2D04-147.
District Court of Appeal of Florida, Second District.
May 4, 2007.
*1041 Zala L. Forizs and Haley Dempsey of Forizs & Dogali, P.L., Tampa, and Nicholas J. DiCarlo of Beus Gilbert, PLLC, Scottsdale, AZ, for Appellant.
John R. Blue, Thomas J. Roehn, and Ellen K. Lyons of Carlton Fields, P.A., Tampa, and Jami Wintz McKeon and John C. Goodchild, III, of Morgan, Lewis & Bockius LLP, Philadelphia, PA, for Appellee.
CANADY, Judge.
In this case, the trial court dismissed with prejudice a complaint against PricewaterhouseCoopers (PWC) filed by Kevin O'Halloran, a chapter 11 bankruptcy trustee for Keller Financial Services of Florida, Inc., and subsidiary corporations (collectively, Keller Financial). The claims asserted by O'Halloran arose from the performance of financial advisory services by PWC for Keller Financial in 1997 and 1998. O'Halloran's claims include "debtors' causes of action," as well as a claim  the noteholder claim  brought pursuant to assignments made to O'Halloran by certain purchasers of secured notes sold by Keller Financial.
The gravamen of the complaint was that PWC, which was retained to give advice concerning the restructuring of Keller Financial, pursued a merger strategy that PWC knew or should have known was futile. By doing so, according to O'Halloran's allegations, PWC delayed Keller Financial's filing for bankruptcy and thereby "allowed Keller [Financial] to become increasingly insolvent and Keller [Financial's] assets to be looted, squandered or otherwise dissipated while PWC pursued [the] futile transaction." O'Halloran also alleged that PWC pursued the merger strategy because it would have involved "a lucrative `transaction fee'" for PWC.
The debtors' causes of action against PWC  that is, claims against PWC allegedly possessed by Keller Financial when it went into bankruptcy  included claims for breach of fiduciary duty (count 1), negligence/professional malpractice (count 2), aiding and abetting breach of fiduciary duty (count 3), breach of contract (count 4), and constructive fraud (count 5). The noteholder claim was for aiding and abetting breach of fiduciary duty (count 6).
The trial court ruled that several of the claims  counts 1, 3, 4, and 5  were subject to dismissal because they were barred by res judicata  or claim preclusion  arising from the bankruptcy court's order confirming the joint plan of liquidation presented in the Keller Financial bankruptcy proceedings. In brief, the trial court concluded that these claims could have been litigated in the bankruptcy proceedings and that the bankruptcy plan did not adequately preserve O'Halloran's right to litigate them after confirmation of the plan by the bankruptcy court.
The trial court also ruled that several of the claims  counts 1, 2, 3, and 4  were barred by the doctrines of imputation and in pari delicto. The trial court reasoned that O'Halloran, as bankruptcy trustee, "stands in the shoes" of Keller Financial and that  according to O'Halloran's own *1042 allegations  Keller Financial was itself involved in wrongdoing "to further its existence." In reaching this conclusion, the trial court relied not only on the allegations of the complaint in the instant case but also on the allegations in a complaint filed by O'Halloran against insiders of Keller Financial and in a complaint filed by O'Halloran against KPMG Peat Marwick, Keller Financial's auditor.
In addition, the trial court ruled that the noteholder claim (count 6) was barred because O'Halloran "is not empowered to bring creditors' claims" and because allowing the claim would create the possibility of "double recovery" by noteholders who did not assign their claims to O'Halloran.
The trial court thus dismissed with prejudice all of the claims against PWC and entered a final judgment in favor of PWC.

1. Principles Governing Review of Dismissed Claims

Since a trial court's ruling on a motion to dismiss presents a question of law, it is subject to de novo review. Siegle v. Progressive Consumers Ins. Co., 819 So.2d 732, 734 (Fla.2002). In conducting such de novo review, the appellate court is "required to accept the factual allegations of the complaint as true and to consider those allegations and any inferences to be drawn therefrom in the light most favorable to" the plaintiff. Aguilera v. Inservices, Inc., 905 So.2d 84, 87 (Fla.2005).
Florida Rule of Civil Procedure 1.110(d) provides that "[a]ffirmative defenses appearing on the face of a prior pleading may be asserted as grounds for a motion [to dismiss] under rule 1.140(b)." Accordingly, a complaint may be dismissed if its allegations show the existence of an affirmative defense to the claims asserted in the complaint. See Boca Burger, Inc. v. Forum, 912 So.2d 561, 568-69 (Fla.2005).

2. The Res Judicata Issue

O'Halloran argues on appeal  as he did before the trial court  that the debtors' claims against PWC were specifically preserved in the bankruptcy proceeding and that the order confirming the bankruptcy plan therefore does not operate to preclude those claims. We conclude that O'Halloran's argument is supported by the record before the trial court concerning the bankruptcy proceedings and the law concerning the preservation of a debtor's claims in bankruptcy.[1]
Section 1123 of the Bankruptcy Code provides that a bankruptcy plan may provide for "the retention and enforcement by the debtor, [or] by the trustee" of "any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3) (1994). Accordingly, although a bankruptcy confirmation order may give rise to res judicata with respect to claims of the debtor that could have been litigated in the bankruptcy proceeding, see Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869, 873-74 (2d Cir.1991), "res judicata does not apply when a cause of action has been expressly reserved for later adjudication," D & K Props. Crystal Lake v. Mut. Life Ins. Co. of N.Y., 112 F.3d 257, 259-60 (7th Cir.1997). There is considerable divergence of opinion concerning the degree of specificity required for an effective retention of a debtor's claim pursuant to § 1123. See Kmart Corp. v. Intercraft Co. (In re Kmart Corp.), 310 B.R. 107, 120 (Bankr.N.D.Ill. 2004) (discussing various views regarding *1043 "how a section 1123(b)(3) retention provision must be written in order to accomplish the desired result").
Here, the trial court's ruling on the res judicata issue can be sustained only if we adopt a strict rule of specificity under which the naming of each cause of action is required for the effective retention of the debtors' claims. We decline to impose such an exacting rule of specificity.
To begin with, the text of § 1123 provides no support for the imposition of such a rule. Furthermore, the context strongly militates against such a rule. "To require a debtor to conjure up and list every imaginable cause of action would unduly complicate the reorganization process and would be unrealistic." EXDS, Inc. v. Ernst & Young LLP (In re EXDS, Inc.), 316 B.R. 817, 824 (Bankr.D.Del.2004). "[M]andating a specific description of every claim the debtor intends to pursue could entail months or years of investigation and a corresponding delay in the confirmation of the plan of reorganization." Katz v. I.A. Alliance Corp. (In re I. Appel Corp.), 300 B.R. 564, 569 (S.D.N.Y.2003); see also Alary Corp. v. Sims (In re Associated Vintage Group, Inc.), 283 B.R. 549, 564 (B.A.P. 9th Cir.2002) (recognizing "the danger of engrafting an unduly burdensome specificity requirement onto the § 1123(b)(3) authorization for the retention and enforcement of claims" and stating that it is "impractical and unnecessary to expect that a disclosure statement and plan must list . . . each and every possible theory" of recovery).
We turn now to the language used in the bankruptcy disclosure statement concerning claims retained against PWC and to our evaluation of the application of the law.
The disclosure statement filed by O'Halloran makes two references to claims against PWC. First, the statement states that "[t]he Debtors may be able to assert claims . . . against . . . accounting firms for professional malpractice." The statement then goes on to specifically list PWC after stating that "all [p]ersons identified herein by . . . name should understand that all claims against them held by the Trustee or the Debtors are preserved and may be asserted following confirmation of the Plan." (Emphasis added.) Second, under the heading of "Professional Liability," the statement again names PWC and states: "All claims held by the Trustee or the Debtors against any professional persons employed, retained, or consulted by the Debtors are reserved for the benefit of the Debtors' creditors under the Plan."
The trial court concluded that the language of the disclosure statement was sufficient to preserve only the claim against PWC for negligence/malpractice (count 2). If the only reference in the disclosure statement to claims against PWC were the reference to "professional malpractice" claims, we would be inclined to agree with the trial court. But the second reference to claims against PWC  under the heading of "Professional Liability"  suggests a broader interpretation of the scope of the claims preserved against PWC. Those provisions of the disclosure statement are most reasonably read as preserving all the asserted claims of the debtors against PWC arising from PWC's professional relationship with Keller Financial. We also conclude, for the reasons that we have discussed above, that such language preserving "all claims" against PWC arising from PWC's professional relationship with Keller Financial was sufficient to be an effective retention pursuant to section 1123.
The trial court read the claim preservation provisions of the disclosure statement in an unreasonably restrictive manner and *1044 applied an unduly exacting requirement of specificity. The trial court therefore erred in dismissing the claim based on res judicata.

3. The In Pari Delicto Issue

O'Halloran contends that the doctrine of in pari delicto is inapplicable (1) because the alleged wrongdoing of the agents of Keller Financial should not be imputed to the corporation or to O'Halloran and (2) because the alleged wrongdoing of Keller Financial's agents is distinct from the alleged wrongdoing of PWC. Considering the allegations of fact before the trial court and the inferences to be drawn from those allegations in the light most favorable to O'Halloran, we conclude that there is merit in both of these arguments advanced by O'Halloran.
In pari delicto means "in equal fault." Black's Law Dictionary 806 (8th ed.2004). The phrase appears in the legal maxim: "Where both parties are equally in the wrong, the position of the defendant is the stronger."[2]Id. at 1725, appendix B. "In pari delicto refers to the plaintiff's participation in the same wrongdoing as the defendant." Memorex Corp. v. Int'l Bus. Machs. Corp., 555 F.2d 1379, 1382 (9th Cir.1977). The defense of in pari delicto "is both an affirmative defense and an equitable defense. Broadly speaking, the defense prohibits plaintiffs from recovering damages resulting from their own wrongdoing." Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir.2006); see also Hall v. Hall, 93 Fla. 709, 112 So. 622, 628 (1927) (referring to "`the universal rule of our law that one in a court of justice cannot complain . . . of another's wrong whereof he was a partaker'") (quoting Bishop, Marriage and Divorce, § 1548).[3]
The defense [of in pari delicto] is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. In its classic formulation, the in pari delicto defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because "in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt." 1 J. Story, Equity Jurisprudence 304-305 (13th ed.1886) (Story).
Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306-07, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (footnotes omitted).[4]
Where the defense of in pari delicto is asserted against a corporate entity based on the misconduct of the corporation's agents, it must be determined whether the misconduct of those agents is properly imputed to the corporation. "As *1045 a general rule, a principal may be held liable for the acts of its agent that are within the course and scope of the agency." Roessler v. Novak, 858 So.2d 1158, 1161 (Fla. 2d DCA 2003).
But if a corporate agent was "acting adversely to the corporation's interests, the knowledge and misconduct of the agent are not imputed to the corporation." State, Dep't of Ins. v. Blackburn, 633 So.2d 521, 524 (Fla. 2d DCA 1994); see also Seidman & Seidman v. Gee, 625 So.2d 1, 2-3 (Fla. 3d DCA 1992) (referring to "an exception to the imputation rule [that] exists where an individual is acting adversely to the corporation"); Joel Strickland Enters., Inc. v. Atlantic Disc. Co., 137 So.2d 627, 629 (Fla. 1st DCA 1962) (stating that knowledge is not imputed to the corporation "where the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, as where an agent is in reality acting in his own business or for his own personal interest and adversely to the principal"). When a corporate agent engages in misconduct that is calculated to benefit the agent and to harm the corporation, the agent has effectively ceased to function within the course and scope of the agency relationship with the corporation. Although formally he acts as the agent of the corporation, in reality he has forsaken the corporation and acts as an agent for himself.
This limitation on the general rule that the acts of a corporate agent are imputed to the corporation is commonly known as the "adverse interest exception." See Tew v. Chase Manhattan Bank, N.A., 728 F.Supp. 1551, 1560 (S.D.Fla.1990); Nerbonne, N.V. v. Lake Bryan Int'l Props., 685 So.2d 1029, 1031 (Fla. 5th DCA 1997); State Dep't of Ins. v. Blackburn (In re Blackburn), 209 B.R. 4, 11 (Bankr. M.D.Fla.1997).
A claim of adverse interest cannot be successfully invoked where the corporate actors whose conduct is at issue were the "alter egos" of the corporation. Where a corporation is wholly dominated by persons engaged in wrongdoing, the corporation has itself become the instrument of wrongdoing. See Terlecky v. Hurd (In re Dublin Sec.), 133 F.3d 377, 380 (6th Cir.1997). This principle comes into play when there is no innocent member of management who could act to thwart the wrongdoing. See Freeman v. Dean Witter Reynolds, Inc., 865 So.2d 543, 551 (Fla. 2d DCA 2003).[5] Conversely, the presence of any innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the in pari delicto defense against the corporation. See Sharp Int'l Corp. v. KPMG LLP (In re Sharp Int'l Corp.), 278 B.R. 28, 39 (Bankr.E.D.N.Y.2002).
*1046 In summary, determining whether misconduct should be imputed to a corporation requires that the focus of analysis be on whether the misconduct was calculated to benefit the corporation. The misconduct will be imputed where the corporation has been operated as an "engine of theft." See Cenco, Inc. v. Seidman & Seidman, 686 F.2d 449, 454 (7th Cir.1982). For example, a "corporation, `whose primary existence was as a perpetrator of [a] Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated.'" Freeman, 865 So.2d at 552 (quoting O'Halloran v. First Union Nat'l Bank of Fla., 350 F.3d 1197, 1203 (11th Cir.2003)). Such a corporation is in no position to invoke the adverse interest exception. Where the misconduct at issue consists, however, in looting the corporation, the corporation  which is itself purely the victim of the misconduct  may properly invoke the adverse interest exception and defeat an in pari delicto defense. See Baena v. KPMG LLP, 453 F.3d 1, 7 (1st Cir.2006) (referring to "looting" as the "classic example" of conduct by corporate agents that falls within the "[a]dverse interest" exception).
The law is well established that under § 541(a) of the Bankruptcy Code, "[a] bankruptcy trustee stands in the shoes of the debtor.'" Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1150 (11th Cir.2006) (quoting O'Halloran, 350 F.3d at 1202). "If a claim of [the debtor] would have been subject to the defense of in pari delicto at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense." Id.; see also Nisselson, 469 F.3d at 153 (stating that "the in pari delicto defense must be available to a defendant in an action by a bankruptcy trustee whenever that defense would have been available in an action by the debtor"). Accordingly, in making his claims pursuant to § 541(a)  that is, the debtors' causes of action  O'Halloran will be barred by PWC's in pari delicto defense to the same extent that Keller Financial would be barred by that defense.
We thus turn to the factual question of whether Keller Financial was in pari delicto with PWC with respect to the alleged wrongdoing which is the basis for the assertion of the debtors' claims by O'Halloran against PWC.
In considering this question and conducting our de novo review of the dismissal of O'Halloran's claims, we are required to consider the allegations of fact and inferences from those allegations "in the light most favorable to" O'Halloran. Aguilera, 905 So.2d at 87. "[A]ll reasonable inferences are allowed in favor of the plaintiff['s] case." Orlando Sports Stadium, Inc. v. State ex rel. Powell, 262 So.2d 881, 883 (Fla.1972). We also must consider this question against the backdrop of the provision of rule 1.110(g) that "[a] party may . . . state as many separate claims . . . as that party has, regardless of consistency."
The complaint against PWC contains two allegations that are particularly pertinent to the in pari delicto issue. The first of these is the allegation that "[a]t no time during the period of PWC's engagement was Keller [Financial] merely a `Ponzi scheme' organized for the purpose of engaging in criminal activity or committing fraud." The second is the allegation that the former president of Keller Financial, Michael Nixon, testified under oath that "had PWC recommended an immediate bankruptcy for Keller [Financial] in the spring of 1997, Nixon would have followed PWC's advice and placed Keller [Financial] into bankruptcy at that time and would not have pursued a restructuring plan involving another company."
*1047 Both of these allegations  which we are required to accept as true in considering the motion to dismiss  seriously undermine the in pari delicto defense. Both allegations support the conclusion that even if agents of the corporation were somehow complicit in the alleged wrongdoing of PWC, the adverse interest exception applies and the wrongdoing of the corporate agents therefore should not be imputed to Keller Financial.
Furthermore, it is not clear from the allegations of the complaint that the alleged wrongdoing of PWC is the same as the alleged wrongdoing of the agents of Keller Financial. Viewing the allegations in the light most favorable to O'Halloran, the alleged misconduct of PWC can be considered distinct from the alleged misconduct of the corporate agents. There is no allegation that the corporate insiders participated in the specific wrongdoing alleged against PWC of pursuing the merger with actual or constructive knowledge that doing so was futile.
Accordingly, we hold that the trial court erred in dismissing claims based on the in pari delicto defense. Of course, our holding with respect to the trial court's ruling on the in pari delicto defense as a basis for dismissal of claims does not foreclose PWC from further litigating the in pari delicto defense issue and establishing the facts necessary to support that defense.

4. The Issue of the Noteholder Assignments

The trial court ruled that O'Halloran was precluded from bringing the claim based on the noteholder assignments because a trustee in bankruptcy "is not empowered to bring creditors' claims." In dismissing the claim based on the noteholder assignments, the trial court also relied on the potential for "double recovery" by nonassigning noteholders. We conclude that the trial court erred in dismissing O'Halloran's noteholder claim.
In support of the trial court's ruling, PWC relies primarily on Caplin v. Marine Midland Grace Trust Co. of New York, 406 U.S. 416, 434, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), which held that a bankruptcy trustee did "not have standing to sue an indenture trustee on behalf of debenture holders." Because the trustee in Caplin had not brought suit based on assignments of the claims of the debenture holders, we conclude that the instant case is easily distinguishable and that Caplin does not provide a basis for affirming the trial court's ruling with respect to the noteholder claims brought by O'Halloran.
The Caplin Court relied on three related grounds to support the conclusion that the trustee lacked standing. First, the Court noted that "nowhere in the statutory scheme is there any suggestion that the trustee in reorganization is to assume the responsibility of suing third parties on behalf of debenture holders." 406 U.S. at 428, 92 S.Ct. 1678. Second, the Court stated that the debenture holders "are capable of deciding for themselves whether or not it is worthwhile to seek to recoup whatever losses they may have suffered by an action against the indenture trustee." Id. at 431, 92 S.Ct. 1678. The court concluded that as "the persons truly affected," the debenture holders "should make their own assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation." Id. Third, the Court observed that "a suit by [the bankruptcy trustee] on behalf of debenture holders may be inconsistent with any independent actions that they might bring themselves." Id. at 431-32, 92 S.Ct. 1678.
The three problems identified by the Court in Caplin are all remedied by the giving of unconditional assignments of *1048 claims to a bankruptcy trustee. In so understanding Caplin, we follow Logan v. JKV Real Estate Services (In re Bogdan), 414 F.3d 507, 512 (4th Cir.2005), which concluded that a "per se ban on trustee suits based on assignments from creditors finds no support in Caplin."
The assignments made to the bankruptcy trustee which were at issue in Logan were of claims by certain mortgage lender creditors against alleged coconspirators of the debtor corporation in a scheme to defraud the mortgage lender creditors. The Logan court pointed to the provision of § 541(a)(7), which provides that the "property of the estate" includes "`[a]ny interest in property that the estate acquires after the commencement' of [the] bankruptcy case." 414 F.3d at 512 (quoting § 541(a)(7)). "Thus, the unconditional assignments" constitute "`property of the estate' that the trustee is authorized to `collect and reduce to money' on behalf of the estate." Id. (citing Steinberg v. Kendig (In re Ben Franklin Retail Stores), 225 B.R. 646, 650 (Bankr.N.D.Ill.1998)). The court concluded that by virtue of the absolute assignments to the trustee, the bankruptcy estate was "the real party in interest" because the trustee was "seeking to collect money it claims the alleged coconspirators owe the trustee as assignee and representative of the estate, not money owed to specific creditors." Id. at 513.
Other courts have similarly concluded that a trustee may bring suit based on assigned claims. See Schnelling v. Thomas (In re AgriBioTech), 319 B.R. 207, 215 (Bankr.D.Nev.2004) ("Because the assignor-[creditors] assigned their claims in full to the Trustee under the [bankruptcy] Plan, those claims became property of the estate under section 541(a)(7) which the Trustee has standing to pursue."); Sender v. Mann, 423 F.Supp.2d 1155, 1173-74 (D.Col.2006) (holding that bankruptcy trustee had standing to bring action based on unconditional assignment of claims by creditors); Semi-Tech Litigation, LLC v. Bankers Trust Co., 272 F.Supp.2d 319, 323 (S.D.N.Y.2003) ("Caplin is distinguishable from this case in that the debenture holders there, in contrast to the situation here, had not assigned their claims to the trustee."), rev'd in part on other grounds, In re Bankers Trust Co., 450 F.3d 121 (2d Cir.2006); Collins v. Kohlberg & Co. (In re Sw. Supermarkets, L.L.C.), 315 B.R. 565, 570-71 (Bankr.D.Ariz.2004) (holding that trustee had standing to pursue on behalf of bankruptcy estate claims assigned by creditors for the benefit of the estate).
The Logan court also held that although the doctrine of in pari delicto would be applicable to the debtor, it would not bar the trustee's suit based on the assignments. The court stated that "[a]s assignee, the trustee stands in the shoes of the [assigning creditors], thereby assuming all rights and interests that the [assigning creditors] have in the causes of action and becoming subject to all defenses that could have been asserted against the [assigning creditors], not [the debtors]." 414 F.3d at 514; see also Sender, 423 F.Supp.2d at 1174 ("[In pari delicto] applies to claims a bankruptcy trustee brings as a debtor, but not as a representative of creditors, since creditors are not culpable for the misconduct of the corporate entity. This doctrine therefore does not bar [the trustee's] claims brought on behalf of creditors . . . by assignment." (citing Caplin, 406 U.S. 416, 92 S.Ct. 1678)).
Here, O'Halloran's complaint alleged that "[u]pon execution of the respective assignments, those claims became property of the Bankruptcy Estate pursuant to Bankruptcy Code section 541(a)(7)" and that "[t]he assigned claims can no longer be pursued by the individual assignors." Documents that were subject to judicial *1049 notice by the trial court indicate that "any proceeds derived from [the assigned] claims will be treated as property under the Liquidation Plan and distributed in accordance therewith." Although the form of assignment  which was also subject to judicial notice  does not expressly state that the assignment of claims was made unconditionally and for the benefit of the bankruptcy estate, for purposes of the motion to dismiss, the factual allegations of the complaint must be accepted as true. Those allegations bring the noteholder claims squarely under the rule articulated in Logan  which we adopt  with respect to unconditionally assigned claims of creditors.
Finally, we reject the trial court's speculation concerning the potential for "double recovery" by nonassigning noteholders. We are unconvinced that such a double recovery will necessarily result even if the noteholders' claim is successfully litigated. Furthermore, we see no reason that such a potential should prevent the assigning noteholders from choosing how they wish to pursue their claims against PWC.
We therefore conclude that the trial court erred in dismissing the noteholder claim.

5. Conclusion

The final judgment in favor of PWC is reversed, and the case is remanded for further proceedings.
Reversed and remanded.
NORTHCUTT and WALLACE, JJ., Concur.
NOTES
[1] Because we conclude that the claims against PWC were preserved, we need not address the argument of O'Halloran that PWC was not a party to the bankruptcy proceeding and thus was not entitled to assert any res judicata effect of the bankruptcy confirmation order.
[2] The Latin maxim is "In pari delicto potior est conditio defendentis." Black's Law Dictionary 1725, appendix B.
[3] The in pari delicto doctrine is a corollary of the doctrine of unclean hands which requires "that no one shall be permitted to profit from his own fraud or wrongdoing, and that one who seeks the aid of equity must do so with clean hands." Yost v. Rieve Enters., Inc., 461 So.2d 178, 184 (Fla. 1st DCA 1984).
[4] Application of the doctrine may yield to public policy considerations: "The defense of in pari delicto is not woodenly applied in every case where illegality appears somewhere in the transaction; since the principle is founded on public policy, it may give way to a supervening public policy." Kulla v. E.F. Hutton & Co., 426 So.2d 1055, 1057 n. 1 (Fla. 3d DCA 1983); see also Turner v. Anderson, 704 So.2d 748, 751 n. 2 (Fla. 4th DCA 1998) (relying on Kulla).
[5] Similarly, the adverse interest exception to the imputation rule has been held inapplicable "where the transaction on behalf of the principal is entrusted solely to the officer or agent having the knowledge." Nerbonne, N.V., 685 So.2d at 1031. The "sole actor doctrine" may be invoked by an innocent third party against the corporation because in such circumstances it makes "sense to impute the agent's knowledge to the corporation, so that the corporation, rather than the third party, should suffer at the hands of the corporate agent." Id. at 1032. By wholly entrusting a matter to its agent, the corporation bears the risk that such an unaccountable agent will act adversely to the corporation's interest. This "sole actor doctrine"  which requires imputation to the corporation of the sole actor's conduct even when that conduct is adverse to the corporation  may not be invoked by an agent against the agent's corporation. Whether the "sole actor doctrine" can be raised in connection with a defense of in pari delicto by a third party where the third party itself has been accused of wrongdoing is an unsettled question in Florida law.